No. 21-3073

In the

# United States Court of Appeals
## for the Sixth Circuit

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ROGER ANDERSON,

*Defendant-Appellant.*

_____

On Appeal from the United States District Court
for the Southern District of Ohio
No. 2:19-cr-67 (Marbley, C.J.)

_____

**BRIEF FOR PLAINTIFF-APPELLEE UNITED STATES**

_____

For the Appellee:

KENNETH L. PARKER
United States Attorney

ALEXIS J. ZOUHARY
Assistant United States Attorney
221 East Fourth Street, Suite 400
Cincinnati, Ohio 45202
(513) 684-3711

# TABLE OF CONTENTS

Table of Authorities ......................................................................... iv

Statement Regarding Oral Argument .................................................... vii

Statement of Jurisdiction........................................................................ 1

Issues Presented ................................................................................... 2

Statement of the Case ............................................................................ 3

    A.   Factual Background ................................................................. 3

        1.   Anderson specialized in infectious disease and
            internal medicine................................................................. 3

        2.   Anderson distributed controlled substances from
            101 Putnam Street................................................................ 4

        3.   Anderson distributed controlled substances
            from Putnam Commons....................................................... 7

        4.   Anderson ignored numerous red flags that his
            patients were abusing or diverting their
            prescriptions .................................................................... 10

        5.   Anderson prescribed dangerous combinations of
            controlled substances ........................................................ 11

        6.   Staff members and pharmacists repeatedly raised
            concerns about Anderson's distribution of controlled
            substances ......................................................................... 11

        7.   The DEA investigated Anderson's prescribing
            practices .......................................................................... 13

B.   Federal Proceedings ................................................................ 14

   1.   Daubert Hearing.............................................................. 15

   2.   Trial Testimony ............................................................... 18

        A.   Marietta Medical Patients ........................................ 19

        B.   Marietta Medical Employees ................................... 22

        C.   Pharmacists ............................................................. 23

        D.   Medical Expert......................................................... 25

        E.   Medicare and Medicaid Program Witnesses
             and Fraud Investigators........................................... 27

   3.   Jury Instructions ............................................................. 28

   4.   Motion for Acquittal, Defense Theory,
        and Jury Verdict.............................................................. 30

Summary of the Argument ................................................................. 32

Argument ............................................................................................ 35

I.   The district court correctly denied Anderson's motion
     for judgment of acquittal................................................................ 35

     A.   Sufficient evidence supported Anderson's convictions
          for conspiracy to unlawfully distribute controlled
          substances and unlawful distribution of controlled
          substances ......................................................................... 36

     B.   Sufficient evidence supported Anderson's conviction
          for health care fraud......................................................... 44

II.    The district court did not abuse its discretion by omitting
       the proposed good-faith instruction, and the omission
       did not prejudice Anderson in any event ...................................... 50

       A.    The concept of good faith was substantially covered
             by the other instructions .................................................... 51

       B.    The omission did not substantially impair
             Anderson's defense ............................................................ 60

III.   The district court did not abuse its discretion by
       admitting expert testimony regarding Anderson's
       prescribing practices .................................................................... 64

Conclusion .............................................................................................. 72

Certificate of Compliance ...................................................................... 73

Designation of Relevant District Court Documents ............................. 74

Certificate of Service ............................................................................. 75

# TABLE OF AUTHORITIES

<u>Cases:</u>

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993) ................................................... 64, 65, 67, 69

*Gonzales v. Oregon*, 546 U.S. 243 (2006)............................................... 52

*Jackson v. Virginia*, 443 U.S. 307 (1979) ...................................... 35, 45

*Kahn v. United States*, S.Ct. No. 21-5261 (Nov. 5, 2021) .................... 51

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999) .................. 65

*Ruan v. United States*, S.Ct. No. 20-1410 (Nov. 5, 2021) .................... 51

*United States v. Azmat*, 805 F.3d 1018 (11th Cir. 2015) .......... 67, 68–69

*United States v. Bek*, 493 F.3d 790 (7th Cir. 2007)................... 47, 48, 49

*United States v. Bonds*, 12 F.3d 540 (6th Cir. 1993)............................ 67

*United States v. Carroll*, 518 F.2d 187 (6th Cir. 1975) ........................ 54

*United States v. Chalhoub*, 946 F.3d 897 (6th Cir. 2020).................... 70

*United States v. Chaney*, 921 F.3d 572 (6th Cir. 2019).................. 44, 62

*United States v. DeBoer*, 966 F.2d 1066 (6th Cir. 1992) ............... 52, 54

*United States v. Elliott*, 876 F.3d 855 (6th Cir. 2017) ......................... 71

*United States v. Farrad,* 895 F.3d 859 (6th Cir. 2018) ........................ 70

*United States v. Feingold*, 454 F.3d 1001 (9th Cir. 2006) ............. 41, 63

*United States v. Godofsky*, 943 F.3d 1011 (6th Cir. 2019)............ passim

*United States v. Hubbard*, 843 F. App'x 667 (6th Cir. 2019)................ 57

*United States v. Hurwitz*, 459 F.3d 463 (4th Cir. 2006) ..... 59–60, 61, 62

*United States v. Kohli*, 847 F.3d 483 (7th Cir. 2017) ...................... 43–44

*United States v. Lang*, 717 F. App'x 523 (6th Cir. 2017) ................ 64, 70

*United States v. LaVictor*, 848 F.3d 428 (6th Cir. 2017)....................... 65

*United States v. Li*, 819 F. App'x 111 (3d Cir. 2020)....................... 67, 69

*United States v. Mahbub*, 818 F.3d 213 (6th Cir. 2016) ...................... 56

*United States v. McIver*, 470 F.3d 550 (4th Cir. 2006).......................... 40

*United States v. Moore*, 423 U.S. 122 (1975) ................................ passim

*United States v. Persaud*, 866 F.3d 371 (6th Cir. 2017) ...................... 45

*United States v. Stewart*, 628 F.3d 246 (6th Cir. 2010) .................. 58–59

*United States v. Volkman*, 797 F.3d 377 (6th Cir. 2015) .............. passim

*United States v. Webb,* 655 F.3d 1238 (11th Cir. 2011) ............ 46–47, 49

*United States v. Word,* 806 F.2d 658 (6th Cir. 1986) ...................... 70, 71

*United States v. Yermian*, 468 U.S. 63 (1984)....................................... 55

*White v. United States*, 399 F.2d 813 (8th Cir. 1968) ........................... 54

Statutes:

18 U.S.C. § 1347.................................................................................... 44

18 U.S.C. § 3231..................................................................................... 1

21 U.S.C. § 801..................................................................................... 51

21 U.S.C. § 822..................................................................................... 51

21 U.S.C. § 823..................................................................................... 51

21 U.S.C. § 841............................................................................. passim

21 U.S.C. § 846............................................................................. 36, 37

28 U.S.C. § 1291................................................................................... 1

Other Authority:

21 C.F.R. § 1306.04....................................................................... 36, 52

Fed. R. App. Proc. 52 ............................................................................ 60

Fed. R. Evid. 702................................................................................... 65

Sixth Circuit Pattern Instruction 14.02 ................................................ 52

## STATEMENT REGARDING ORAL ARGUMENT

The facts and legal arguments of the parties are adequately presented in the briefs and the record. Oral argument is therefore unnecessary.

# STATEMENT OF JURISDICTION

Jurisdiction was proper in the district court under 18 U.S.C. § 3231 because Defendant-Appellant Roger Anderson was charged with and convicted of federal crimes. On January 14, 2021, the district court entered its judgment of conviction and sentence. Anderson filed a timely notice of appeal on January 22, 2021. This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

# ISSUES PRESENTED

1. Whether the district court correctly denied Anderson's motion for judgment of acquittal, where the evidence overwhelmingly established each element of the offenses of conviction. (*Anderson's third and fourth issues*)

2. Whether the district court abused its discretion in omitting a good-faith jury instruction, where the concept was substantially covered by the other instructions and the omission did not substantially impair the defense. (*Anderson's second issue*)

3. Whether the district court abused its discretion in admitting expert testimony on Anderson's prescribing practices, where the expert based his methodology on sources generally accepted by the medical community and his own extensive experience in pain management. (*Anderson's first issue*)

# STATEMENT OF THE CASE

Following an eight-day trial, a jury convicted physician Roger Anderson of one count of conspiracy to unlawfully distribute controlled substances, eight counts of unlawful distribution of controlled substances, and one count of health care fraud. The convictions arose from opioid prescriptions Anderson issued to patients who showed clear signs of drug abuse and diversion. On appeal, Anderson challenges the sufficiency of the evidence supporting his convictions, the jury instructions, and the expert testimony.

## A. *Factual Background*

### 1. Anderson specialized in infectious disease and internal medicine.

Roger Anderson worked as a physician in the small town of Marietta, Ohio. (R.83, tr., 1153.) Anderson was licensed to practice medicine by the Ohio Medical Board and was licensed to dispense controlled substances by the Drug Enforcement Administration (DEA). (*Id.*, 1152, 1154-55, 1200-01.) He specialized in infectious disease and internal medicine. (*Id.*, 1147, 1155, 1200.)

3

Anderson was employed by Memorial Health System. (R.87, tr., 2042.) He rendered inpatient services at Marietta Memorial Hospital, where he practiced emergency medicine and hospitalist medicine; and he rendered outpatient services at Marietta Medical, an infectious disease and internal medicine practice. (*Id.*, 2042-43.)

2. <u>Anderson distributed controlled substances from 101 Putnam Street.</u>

Marietta Medical was located at 101 Putnam Street, a building Anderson owned in downtown Marietta. (R.84, tr., 1306; R.88, tr., 2358.) Anderson saw approximately ten or eleven patients per day, treating them for infectious disease and a variety of other medical issues falling within his general practice. (R.87, tr., 2013-15.)

Over time, however, the practice attracted an increasing number of patients seeking opioids. (R.84, tr., 1309-10; R.87, tr., 2014-15.) Many of these patients were addicted to drugs, with some displaying visible signs of addiction. (R.83, tr., 1227, 1244; R.86, tr., 1783-86, 1932, R.88, tr., 2273-74, 2332, 2336, 2448.)

Given Anderson's other obligations, which included shifts at Marietta Memorial Hospital and locum tenens work, he often arrived at Marietta Medical late—sometimes significantly so. (R.87, tr., 2026-27,

4

2112.) Anderson's tardiness, combined with the increase in patients seeking opioids, created "chaos." (R.84, tr., 1335, 1337; R.87, tr., 2112.) The waiting room became crowded, "packed from wall to wall" with "fidgety" patients anxious to receive their prescriptions. (R.83, tr., 1224; R.87, tr., 2114-15.) As wait times grew, patients became increasingly "demanding" and "irritated," repeatedly interrupting employees to ask when they could be seen. (R.87, tr., 2020-21, 2025-26, 2114-15.)

But no matter how long the wait, the patients waited—sometimes up to five hours—to get their prescriptions. (*Id.*, 2112-14.) As a result, it was not uncommon for patients to overflow into the hallway, snake down the stairs, and spill onto the street. (*Id.*, 2112; R.83, tr., 1224; R.86, tr., 1787.)

While the waits were long, the appointments were short. (*E.g.*, R.83, tr., 1224; R.86, tr., 1781, 1829.) For his "pill-seeker" patients (R.84, tr., 1334), Anderson performed superficial medical examinations or none at all; and he often did not establish objective medical diagnoses, obtain medical histories and records, or develop treatment plans. (*E.g.*, R.57, tr., 357-663; R.83, tr., 1224; R.86, tr., 1790-91, 1833,

1930-31; R.87, tr., 2015-16; R.88, tr., 2274-75.) He simply signed prescriptions.

Stephen Brown, a licensed practical nurse who worked at Marietta Medical as an office manager, became concerned that Anderson's patients were abusing drugs based on failed drug screens and evidence of doctor shopping. (R.87, tr., 2014-20.) Brown relayed his concerns of drug abuse and diversion to Anderson, but Anderson did not change his prescribing practices. (*Id.*)

The administration of Memorial Health System also reached out to Anderson with concerns because the practice had not completed medical charting necessary for billing. (*Id.*, 2028.) Anderson asked Brown to help him catch up on the charting, including "fill[ing] out the patient's forms on the electronic file." (*Id.*) Brown did so, but he "did not feel at ease" with the process. (*Id.*) Brown ultimately elevated his concerns to the health system. (*Id.*, 2029.)

The administration conducted an investigation in response to Brown's complaint. (R.87, tr., 2047.) The investigation found that Anderson had failed to appropriately authenticate patient medical records. (*Id.*) As a result, the health system terminated Anderson's

employment and placed Brown in a different job. (*Id.*, 2029, 2044-45, 2047.)

Although no longer employed by Memorial Health System, Anderson continued to practice at—and prescribe from—Marietta Medical. Word of mouth proved to be "the best referral" and more pill-seekers came to the practice, totaling 60% of all patients. (R.84, tr., 1310-11, 1334.) The "chaos" also continued, culminating in a fight outside of the practice that required police intervention. (*Id.*, 1307, 1336-37, 1350.) The incident prompted Anderson to move the practice. (*Id.*, 1348-49.)

### 3. Anderson distributed controlled substances from Putnam Commons.

Anderson did not move the practice very far. He relocated Marietta Medical to a different building he owned just down the street. (R.84, tr., 1350.) Two employees, Teddy Tackett and Mollie Reed, moved with Anderson from the old location to the new one. (*Id.*, 1306-07; R.87, tr., 2109-10.)

Known as Putnam Commons, the multi-story building had a café and various shops on the first floor. The first floor also featured a

central kiosk where shoppers could check out. (R.84, tr., 1365-66.) Anderson's practice occupied the second floor. (*Id*.; *id*., 1349, 1354.)

The new location was more spacious and kept patients "off the street." (R.84, tr., 1348-49.) But the other problems remained. For one, the office "was still disorganized." (R.87, tr., 2117.) Although the practice had approximately two hundred active patients, there were many more files than that. (*Id*.) The cabinets contained files for inactive patients and some patients had multiple files—up to five for a single patient. (*Id*., 2118.) The files themselves were thin—sometimes holding a single piece of paper. (*Id*.)

In addition, despite the increased capacity, the waiting room at Putnam Commons overflowed with patients. Some waited in the stairwell, while others loitered around the shops on the first floor. (R.84, tr., 1358; R.86, tr., 1789, 1934, 1945; R.88, tr., 2283-84.) In fact, the number of pill-seekers increased at Putnam Commons. (R.84, tr., 1356, 1375; R.87, tr., 1288; R.88, tr., 2262-63.) At the new location, the portion of pill-seekers grew to comprise 80% of Anderson's patients. (R.83, tr., 1288; R.84, tr., 1355-56; R.87, tr., 2128, 2135.)

Anderson's hectic schedule and chronic tardiness also continued to cause long waits. (R.86, tr., 1935; R.87, tr., 2112, 2130; R.88, tr., 2323, 2269.) Because Anderson worked at Marietta Medical only a few days a week, he saw up to thirty patients per day. (R.87, tr., 2127; R.88, tr., 2347.) And if Anderson were in the office just one day a week, he would see even more—up to forty per day. (R.87, tr., 2127.)

As at the prior location, appointments consisted of patients telling Anderson what prescriptions they wanted and Anderson writing those prescriptions. (R.86, tr., 1838-39.) A typical appointment lasted less than five minutes. (R.86, tr., 1935-36, 1952, 1954; R.87, tr., 2129-30.)

When Anderson was out of the office—which was a frequent occurrence—patients still received their prescriptions. They specified what medications they wanted by speaking with a Marietta Medical employee, leaving a message on the office phone, or by calling or texting Anderson on his personal cell phone. (R.84, tr., 1376; R.86, tr., 1933; R.87, tr., 2132-33; R.88, tr., 2249.) Reed would often write the prescriptions and leave them for Anderson's signature. (R.87, tr., 2132.)

Because Anderson was frequently away from the office, Reed and Tackett passed out prescriptions from the shopping kiosk on the first

floor. (R.84, tr., 1365-66; 1373; R.86, tr., 1840.) Patients found the process "very easy [and] very convenient." (R.86, tr., 1841.)

4. <u>Anderson ignored numerous red flags that his patients were abusing or diverting their prescriptions.</u>

At both locations, Anderson routinely ignored direct evidence that his patients were addicted to controlled substances. He prescribed opioids to patients who not only displayed signs of drug addiction but who openly admitted to being addicted. (R.83, tr., 1227, 1244; R.86, tr., 1951.)

Anderson also ignored the results of drug screens showing the presence of illegal drugs and other drugs that had not been prescribed and the absence of drugs that had been prescribed. (R.57, tr., 357-663.) In addition, when patients requested early refills—another red flag that medication is being abused—Anderson did not question their requests. (R.86, tr., 1836-37; R.88, tr., 2331-32.) Instead, he recommended out-of-state pharmacies that would fill them and told patients to pay cash. (R.83, tr., 1226-27; R.86, tr., 1836-37.)

Finally, Anderson failed to properly utilize Ohio's prescription monitoring program (OARRS), which documents the controlled substances prescribed to a patient. (R.57, tr., 357-663; R.86, tr., 1822-

10

24; R.87, tr., 2018, 2137-39.) The system showed that Anderson's "patients were shopping around for different doctors." (R.87, tr., 2018; R.57, tr., 389, 403, 415, 434, 439, 446, 497, 504, 509.)

5. <u>Anderson prescribed dangerous combinations of controlled substances.</u>

Anderson prescribed dangerous combinations of controlled substances that increased the risk of adverse side effects, overdose, and death. (*E.g.*, R.57, tr., 383-87, 416-17, 434, 448-49, 451.) This included prescribing amphetamines with an opioid ("a prescription speedball"); opioids with a benzodiazepine and the muscle relaxant Soma ("The Holy Trinity"); and redundant opioids and benzodiazepines ("therapeutic duplication"). (*Id.*)

6. <u>Staff members and pharmacists repeatedly raised concerns about Anderson's distribution of controlled substances.</u>

Staff members at Marietta Medical—including Brown, Reed, and Tackett—repeatedly voiced concerns to Anderson about his prescribing practices. Despite having no medical background, Tackett and Reed tried to implement changes to "improve the practice" and prevent drug addicts from receiving prescriptions. (R.83, tr., 1281; R.87, tr., 2099-2100, 2134-36.) The changes included displaying a sign in the

lobby that said "does not prescribe narcotics;" requiring patients to sign narcotic agreements that provided, among other things, that if prescriptions were stolen or missing, no refills would be issued; requiring consistent drug screens; properly utilizing OARRS; and attempting to increase Anderson's presence in the office. (*Id.*; R.88, tr., 2273.)

Tackett and another staff member eventually confronted Anderson over dinner and asked him to close the practice on account of "the number of people seeking . . . pain medicine and the chaos that went with it." (R.84, tr., 1392-94; R.88, tr., 2324-25.) Anderson refused. (R.84, tr., 1396.)

Concerns about Anderson's prescribing practices extended beyond Marietta Medical staff. A nurse practitioner who agreed to fill in for Anderson felt "uncomfortable" with the prescribing practices she observed. (R.88, tr., 2336.) During her two days at Marietta Medical, she saw almost exclusively pain-management patients but most "had not had the normal progression of imaging or physical therapy or any kind of referral to specialists" that she expected. (*Id.*, 2196-99.) The patient files were "really just empty manila folders" with no medical

history or imaging records. (*Id.*, 2196.) And if a folder did have something inside, it was a list of the patient's medications and occasionally an OARRS report. (*Id.*) A few folders had prescriptions already attached to them. (*Id.*, 2199.) The nurse practitioner observed that "[a]lmost every single patient . . . was being given some kind of narcotic pain medication"—mainly Percocet and Vicodin. (*Id.*, 2197.) When Marietta Medical staff asked the nurse practitioner if she would be interested in coming back, she declined. (*Id.*, 2200.)

Local pharmacists also raised concerns about Anderson's prescribing practices and eventually refused to fill his prescriptions. (R.85, tr., 1536-44; R.86, tr., 1821-35; R.88, tr., 2331-37.) One pharmacist ultimately called the DEA to report her concerns. (R.88, tr., 2336-37.)

7. <u>The DEA investigated Anderson's prescribing practices.</u>

The complaint prompted the DEA to initiate a compliance investigation of Anderson. (R.83, tr., 1145, 1147.) While the investigation was ongoing, one of Anderson's patients separately reported concerns about Anderson's prescribing practices to the local

sheriff's office, which put the patient in touch with the DEA. (R.86, tr., 1939-40.)

The DEA asked the patient to become a confidential source (CS), and he agreed. (R.83, tr., 1162; R.87, 1941-42.) Under the DEA's supervision, the CS visited Marietta Medical eight times while wearing a covert recording device. (R.83, tr., 1164-65; R.86, tr., 1856, 1877, 1944-61.) The recordings confirmed that the CS received opioids from Anderson or his staff by doing no more than requesting them. (*Id.*) In one recording, the CS told Anderson that he was "in full-blown withdrawal" and asked for a Vicodin prescription. (R.86, tr., 1950-52.) Anderson wrote the prescription. (*Id.*) Another recording captured the CS picking up a new Vicodin prescription from the office without seeing Anderson. (*Id.*, 1958-59.)

*B. Federal Proceedings*

The DEA executed search warrants at the current and former Marietta Medical offices, seizing medical files, prescriptions, and an appointment book, among other documents. (R.83, tr., 1165, 1188.) Following the search, a Southern District of Ohio grand jury returned a

fourteen-count indictment against Anderson related to his distribution of controlled substances. (R.1, indictment, 1-18.)

Anderson elected to proceed to trial, where the government narrowed the charges to one count of conspiracy to unlawfully distribute controlled substances, eight counts of unlawful distribution of controlled substances, and one count of health care fraud. (*Id.*; R. 40, verdict, 293-302.)

1. <u>Daubert Hearing</u>

Prior to trial, the government disclosed its intention to call Dr. Timothy King, a physician board-certified in pain management and addiction medicine, to testify as an expert witness on Anderson's prescribing practices. (R.29, order, 261-62.) Dr. King conducted a review of fifty patient files based on "over thirty years of experience in the practice of pain management" and on the following standards:

> establishment of an objective medical diagnosis; documentation of a pertinent clinical history; performance of a pertinent and targeted physical examination; presence of an adequate and thorough clinical workup; delineation of mental health risk factors; delineation of co-morbid risk factors; documentation of a defined treatment plan; consideration of high-risk combinations; consideration of risks associated with high dose opiates; appropriate use of urine drug testing;

15

> appropriate use of (state provided) prescription drug monitoring data; documentation of objective improvement in pain and function; documentation and enforcement of drug related misbehavior; and ongoing clinical evaluation, risk assessment, and patient monitoring.

(R.16-2, decl., 100-02.) He relied on the following sources in developing those standards and in rendering his opinions: a model policy on the use of opioids to treat chronic pain, published by the Federation of State Medical Boards; two peer-reviewed articles, *Universal Precautions in Pain Medicine*, published by Pain Medicine, and *Opioid Treatment Guidelines*, published by the Journal of Pain; and guidance issued by the DEA and the CDC. (*Id.*, 102-03.)

Dr. King created a series of spreadsheets and narrative summaries in which he applied and explained these standards in arriving at his opinions. (R.24, hearing, 142-45.) The materials included a "forensic chronology," a spreadsheet reflecting all of the information contained in a patient's records, which Dr. King relied on extensively in forming his opinions. (*Id.*, 143-44.) The materials also included individual patient narratives in which Dr. King opined as to whether Anderson prescribed opioids without a legitimate medical purpose and

outside the usual course of professional practice to specific patients. (App. App'x (Vol. II), 1060-76.)

Anderson moved to exclude Dr. King's proposed testimony on the ground that it was not sufficiently reliable (R.13, motion, 70-73; R.24, hearing, 207.) Anderson acknowledged that "this kind of testimony ha[d] been offered in other cases" but maintained that Dr. King's testimony was not reliable because his specific methodology of chart review had not been peer-reviewed or endorsed by a major medical association. (R.24, hearing, 208.) Anderson even went so far as to contend that there was "not a peer-reviewed, tested, or verifiable way for any physician" to render a reliable analysis. (*Id.*, 208.)

After conducting a Daubert hearing, where Dr. King testified and was cross-examined, the district court issued a written opinion and order denying the motion. (R.29, order, 261-66.) The court held that Dr. King's proposed testimony was reliable pursuant to Rule 702 and Daubert. (*Id.*, 265.) The court acknowledged the "lack of peer review of Dr. King's specific method for analyzing patient charts." (*Id.*) But the court found Dr. King's method sufficiently reliable based on his thirty years of experience in pain management and his application of

17

"generally accepted methodologies and standards of care . . . , including standards recognized by national organizations such as the Federa[tion] of State Medical Boards." (*Id.*, 265-66.) The court further found that Anderson's remaining concerns about Dr. King's methodology went to "the weight of [the] testimony" and could be addressed through cross-examination. (*Id.*, 266.)

    2. <u>Trial Testimony</u>

The government's case-in-chief featured testimony from twenty-four witnesses. The witnesses included: law enforcement officers who participated in the investigation; employees who witnessed Anderson's prescribing habits; the nurse practitioner who filled in for Anderson and was uncomfortable with what she observed; local pharmacists who raised concerns about—and eventually refused to fill—Anderson's prescriptions; a CVS Health representative who detailed the company's investigation into Anderson's prescribing practices and resultant suspension of his privileges; and patients who admitted to abusing the controlled substances Anderson prescribed to them. The jury also heard testimony from program administrators for Medicare and Medicaid, who testified that the health programs do not pay for medically

18

unnecessary or unlawful prescriptions, and from analysts who testified
about how much the programs paid for prescriptions that Anderson
issued illegitimately.

### A. Marietta Medical Patients

Anderson's patients testified that they were drug addicts who
sought prescriptions to feed their addictions. (*E.g.*, R.86, tr., 1783-86 ("I
have been an addict since I was 12 years old."); R.88, tr., 2273-74 ("I
was [ ] an addict."); R.86, tr., 1934  ("I was in full-blown dependency, an
addiction [to] narcotics.").) One patient recalled being "taken aback"
when he went to the office for the first time and found himself "looking
at people in the same situation." (R.86, tr., 1934.) Another patient
testified that he became "an addict" only after getting "massive
amounts" of opioids from Anderson. (R.88, tr., 2352-53.).

The patients characterized Anderson's practice as consisting
primarily of prescription-writing. One patient described a typical
appointment as lasting "two or three minutes" and including "small
talk" and script writing. (R.86, tr., 1935–36.) Patients testified that they
told Anderson what medications they wanted, and he prescribed them;
and that Anderson increased dosages when they told him their

medications "w[eren't] working as well." (R.86, tr., 1838; R.88, tr., 2278-79.) One patient recalled asking Anderson to decrease a dosage because there were "so [many] pills" and her mom—who was also an addict—would "really beg" for them. (R.86, tr., 1792.)

Patients testified that they abused the pills, shared the pills, and traded or sold the pills for illegal drugs. One patient chewed Vicodin pills at Anderson's recommendation. (R.86, tr., 1793.) Another crushed and snorted pills and ate the gel from a fentanyl patch. (R.88, tr., 2277.) When prescriptions ran out early due to abuse or diversion, patients had no trouble getting Anderson to write another one. A simple phone call or text would take care of it. (*E.g.*, R.83, tr., 1225-26, 1230-31; R.84, tr., 1333, 1376; R.86, tr., 1835.)

While patients could always depend on Anderson to write prescriptions, they could not depend on pharmacies to fill them. For a time, Walmart was the only pharmacy in town that would fill Anderson's prescriptions. (R.83, tr., 1234.) Eventually, even Walmart refused. A pharmacist actually "ripped [] up" one patient's prescription "in front of [her] face and threw it in the trash." (*Id.*, 1235.)

20

Patient JB presented perhaps the most egregious example of Anderson's prescribing practices. JB testified that she was an intravenous drug addict who went to Anderson "seeking opiates." (R.83, tr., 1223.) She explained that it was "very obvious" she was a drug addict because she had "marks all over [her] arms" and her "face [was] picked up." (*Id.*, 1227.)

At her first appointment, JB told Anderson she had pain in her knee, even though nothing was wrong with it. (*Id.,* 1224-25.) Anderson prescribed the medications she asked for, "no questions asked." (*Id.*) JB "rarely" met Anderson in an exam room after her first appointment because he was "always so busy." (*Id.*, 1225.) Instead, she requested refills by texting his personal cell phone. (*Id.*; *id.*, 1231.) JB testified that Anderson increased the dosage of her medication when she told him the current dosage wasn't "cutting the mustard." (*Id.*, 1229.) She traded or sold the pills Anderson prescribed her for heroin or methamphetamine. (*Id.*; *id.*, 1227.)

JB testified that when she claimed a prescription had been stolen, Anderson did not question her claim. (*Id.*, 1225, 1246-47.) He simply wrote a new prescription and advised her to fill it at a different

pharmacy in West Virginia. (*Id.*, 1226, 1247.) Anderson wrote the new prescription at "about 11:30 at night" when he "was the only one in [the office]." (*Id.*, 1246-47.) On another occasion, JB recalled that Anderson wrote her a prescription in a Kroger's parking lot. (*Id.*, 1128, 1231.)

JB testified that Anderson's prescriptions were the "easiest prescriptions" to obtain. (*Id.*, 1237.) In fact, Anderson continued to prescribe her opioids and other controlled substances when she became pregnant; and he did not stop prescribing them until she was eight-and-a-half months along with a "basketball belly." (*Id.*, 1235-37.) JB told jurors that she gave birth to "an addicted-born baby" who "was life-flighted" to a different hospital after being born. (*Id.*, 1249.)

## B. Marietta Medical Employees

Several employees testified, including Stephen Brown, Teddy Tackett, and Mollie Reed. They described the practice as "disorganized," "crazy," and "chaotic." (R.84, tr., 1335-37, 1355; R. 87, tr., 2110-12, 2117.) And they characterized Anderson as chronically late. (R.84, tr., 1357-58; R.87, tr., 2112-23.) Tackett and Reed recalled that the number of pill-seekers increased after the practice moved to Putnam Commons

and estimated that 80% of Anderson's patients were pill-seekers at that location. (R.84, tr., 1356; R.87, tr., 2128, 2135-36.)

Tackett and Reed also testified about their roles in the process. (R.84, tr., 1319-22; R.87, tr., 2093.) Reed testified that she would write prescriptions based on what patients told her and then leave them in a pile for Anderson to sign at night. (R.87, tr., 2144-46.) Reed and Tackett admitted to passing out prescriptions to patients from the kiosk. (R.84, tr., 1319-20; R.87, tr., 2093, 2144-46.)

### C. Pharmacists

Jurors also heard from local pharmacists who refused to fill Anderson's prescriptions. The pharmacists testified that when a prescription is presented, they have a corresponding responsibility "to make sure the prescription is written for a legitimate medical purpose." (R.85, tr., 1535-36; R.88, tr., 2329-30.) They recalled that Anderson's prescribing practices raised significant red flags, including: repeated early refill requests, sometimes accompanied by claims of lost and stolen medication; young patients on high doses of opioids; and prescription database reports showing evidence of doctor shopping. (R.85, tr., 1536-38; R.86, tr., 1821-24; R.88, tr., 2331-37.) And they

23

recounted what they did in response: contacting (or attempting to contact) Anderson with concerns; filing refusal-to-fill reports; and lodging complaints with the pharmacy board, medical board, and DEA. (R.85, tr., 1536-44; R.86, tr., 1824-35; R.88, tr., 2336-37.) One pharmacist, explaining her refusal to fill Anderson's prescriptions, referenced the "Hippocratic oath . . . [she took] [t]o do no harm." (R.88, tr., 2337-38.)

An employee of the CVS Health retail pharmacy operations division, who was "a pharmacist by training," testified that a review of Anderson's prescribing practices revealed him to be "an outlier" in all four metrics: volume of oxycodone prescriptions; age share; cash share; and distance. (*Id.*, 2206, 2210-12.) The employee testified that CVS sent Anderson two letters requesting an opportunity to speak with him in order "to gain a better understanding . . . [of] those trends." (*Id.*, 2213.) When Anderson did not respond, CVS suspended his prescribing privileges. (*Id.*, 2213-14.)

The employee testified that Anderson later sought reinstatement of his privileges, which required completion of a reinstatement application. (*Id.*, 2224.) In the application, Anderson claimed that he

24

used "OARRS reports, and urine drug screens, and pill counts" to "prevent misuse, abuse, and diversion of controlled substances." (*Id.*, 2228-29.) He also declared his intention "never [to] treat chronic pain management patients again ever." (*Id.*, 2230.) CVS reinstated Anderson's privileges based on his responses. (*Id.*, 2231.)

### D. Medical Expert

Dr. King testified for the government about Anderson's prescribing habits. Dr. King explained that he reviewed fifty patient files, twenty-eight of which involved prescriptions for controlled substances. (R.57, tr., 392-93.) Dr. King opined that Anderson prescribed controlled substances without a legitimate medical purpose and outside the usual course of medical practice in twenty-four of those twenty-eight files.[1] (*Id.*; R.89, tr., 2437-38.)

Dr. King discussed Anderson's treatment of numerous patients, including the patients whose prescriptions were the subjects of the distribution counts. Dr. King's review of the medical records showed

---

[1] Dr. King testified that he had insufficient information to render a conclusion about three of the four remaining patients. (R.57, tr., 527-30.) Dr. King conceded that his analysis of one patient file would need to be revisited because it contained records from two patients with the same name. (*Id.*, 531-42.)

that Anderson often failed to establish objective diagnoses, conduct meaningful medical examinations, obtain medical histories and records, consider comorbidities and other risk factors, enforce patient compliance, discuss alternative treatments, or provide any treatment plans. (R.57, tr., 357-663.)

It also showed that Anderson's prescribing practices, which included prescribing dangerous combinations of controlled substances to patients who demonstrated clear signs of drug abuse and diversion, violated standard medical practice. (*Id.*) For example, Anderson prescribed opioids to a patient after he tested negative for the prescribed medication but positive for cocaine and unprescribed controlled substances. (*Id.*, 448-53.) Another patient had "a single drug screen" over the course of two-and-a-half years, which was "way below the standard of care." (*Id.*, 463-64.) And that single drug screen "failed to show the presence of [the patient's] prescribed medications." (*Id.*) Dr. King also testified that Anderson ignored OARRS reports that showed evidence of doctor shopping and pharmacy shopping. One patient, for example, saw seven doctors in a five-month period but still received opioids from Anderson. (*Id.*, 414-15.)

26

Dr. King specifically addressed the eight prescriptions underlying the distribution counts, opining that the medications were not distributed for a legitimate medical purpose in the usual course of medical practice and explaining why that was so. (R.57, tr., 420-32 (JB-Count 2), 474-81 (JT-Count 3), 401-20, 424-25 (KB-Count 4), 439-48 (AG-Count 5), 432-36 (JC-Count 6), 448-62 (RR-Count 7), 465-74 (GS-Count 8), 462-73 (CS-Count 9). For example, Anderson continued to prescribe oxycodone to JB (Count 2), despite drug screens that repeatedly showed its absence, suggesting it was being used as a "trade good," and despite medical records that revealed her to be pregnant. (*Id.*, 420-32.) Dr. King found Anderson's prescribing of opioids to JB "highly disturbing" because such use is associated with miscarriage, cardiac abnormalities, and an opioid-dependent baby. (*Id.*, 430-31.)

### E. Medicare and Medicaid Program Witnesses and Fraud Investigators

Witnesses affiliated with Medicaid and Medicare testified that Anderson entered into provider agreements with those federal health care programs. (R.87, tr., 2064-65, 2071-72, 2076-80.) Pursuant to the agreements, Anderson agreed to render services that were "medically necessary" and in "compl[iance] with [] laws, regulations, and program

instructions." (*Id.*, 2064, 2069-70, 2078-79.) The witnesses thus testified that Medicare and Medicaid would not pay for "prescription drugs [] issued in violation of state or federal law." (*Id.*, 2073, 2081.) Fraud investigators then testified that Medicare and Medicaid (or Medicaid MCOs) had, in fact, paid thousands of dollars for prescription drugs that Dr. King concluded were issued by Anderson without a legitimate medical purpose and outside the usual course of professional practice. (*Id.*, 2055-61, 2085-89.)

3. <u>Jury Instructions</u>

The government initially submitted a proposed jury instruction on good faith relative to the unlawful-distribution counts. (R.26, gov't inst., 240.) That instruction provided:

> If a doctor dispenses a drug in <u>good faith</u> in medically treating a patient, then the doctor has dispensed the drug for a legitimate medical purpose in the usual course of medical practice. That is, he has dispensed the drug lawfully.
>
> <u>Good faith</u> in this context means good intentions in the honest exercise of best professional judgment as to a patient's need. It means the doctor acted in accordance with what he believed to be proper medical practice. If you find the defendant acted in good faith in dispensing the drugs, then you must find him not guilty.

(*Id.* (emphases in original).)

28

At the charge conference, the government changed course. Citing *United States v. Godofsky*, 943 F.3d 1011 (6th Cir. 2019), the prosecutor requested that the district court remove the good-faith instruction it had previously proposed. (R.88, tr., 2304-10.) Defense counsel objected to its exclusion, arguing that the instruction was "consistent with the law" and that *Godofsky* was factually distinguishable because it was a "traditional pill mill prosecution" and Anderson's case was not. (*Id.*, 2306; R.89, tr., 2390-92.)

After taking the issue under advisement, the district court found the case "virtually on all fours" with *Godofsky*, which "sa[id] that the [unlawful-distribution] instruction itself . . . subsumes the good faith defense." (R.89, tr., 2388, 2390.) The court acknowledged that it was "kind of going back and forth" because, under its reading of *Godofsky*, it would not "necessarily . . . be wrong for giving it" but it "would be right for not giving it." (*Id.*, 2392.) Ultimately, however, the district court removed the good-faith instruction over defense counsel's objection. (*Id.*, 2395.)

29

4.  Motion for Acquittal, Defense Theory, and Jury Verdict

At the conclusion of the government's case, the defense moved for a judgment of acquittal. (R.88, tr., 2366-73; 2380-81.) The district court denied the motion. (*Id.*, 2381-82.)

Anderson did not present a defense case. Instead, defense counsel questioned the quality of the government's investigation and sought to undermine the credibility of the government's witnesses, including the CS, Anderson's unindicted co-conspirators (Tackett and Reed), and his patients. (*E.g.*, R.89, tr., 2432-34, 2439-41, 2444-45.) Defense counsel also challenged Dr. King's opinions in several ways, including: highlighting instances where Anderson had performed examinations, obtained imaging, made referrals, or ordered testing; emphasizing that Anderson's patients suffered from various medical conditions that could conceivably cause pain; and arguing that Dr. King examined a "very small percentage of the patient population." (*Id.*, 2435-48.)

In closing, defense counsel highlighted "Appalachia['s] [] huge narcotic abuse problem" and argued that Anderson was "trying to do the best he [could] under difficult circumstances." (*Id.*, 2428, 2449.) Defense counsel admitted that the practice was "not as well run as it should

[have] been," but argued that there was a difference between "whether the practice [was] poorly run versus whether there's proof beyond a reasonable doubt that Dr. Anderson engaged in criminal activity." (*Id.*, 2429, 2449.)

The jury convicted Anderson on all ten counts. This appeal followed.

# SUMMARY OF ARGUMENT

The district court correctly denied Anderson's motion for judgment of acquittal. Pill-seekers waited for hours in a crowded, chaotic office for an appointment lasting a few minutes. Anderson did not medically treat these patients; he simply signed opioid scripts for them. In fact, Anderson routinely issued refills without seeing patients at all. Pill-seekers placed their prescription orders with the office and then picked them up from a shopping kiosk—the process resembling restaurant takeout more than medical practice.

Anderson prescribed opioids in this manner despite obvious red flags. Patients showed physical signs of drug abuse and openly admitted to drug addiction; repeatedly requested early refills; returned alarmingly irregular drug screens showing drug abuse and diversion; and engaged in doctor and pharmacy shopping by obtaining additional quantities of controlled substances from other providers. And Anderson continued prescribing in this manner even after staff members implored him to close the office and pharmacies refused to fill his prescriptions. Sufficient evidence supported Anderson's convictions for conspiracy to unlawfully distribute and unlawful distribution.

32

Sufficient evidence similarly supported Anderson's health care fraud conviction. The evidence summarized above demonstrated that Anderson knew the prescriptions he issued to pill-seekers lacked a legitimate medical purpose. And additional evidence established Anderson's knowledge that patients submitted claims for these prescriptions to Medicare and Medicaid, and that those prescriptions were not properly reimbursable.

The district court did not abuse its discretion by declining to include the initially proposed good-faith jury instruction. The instructions given required the jury to find that Anderson knowingly prescribed controlled substances without a legitimate medical purpose in the usual course of professional practice. The concept of good faith was thus substantially covered because Anderson could not have knowingly prescribed controlled substances without a legitimate medical purpose and also acted in good faith.

The omission of an explicit good-faith instruction did not substantially impair Anderson's defense, in any event. Counsel effectively advanced a good-faith defense to the jury without objection from the government. The problem for Anderson was not the lack of a

good-faith instruction; it was the lack of evidence that he acted in good faith.

Finally, the district court did not abuse its discretion by admitting the expert testimony of Dr. King. The district court appropriately found Dr. King's method of chart review reliable because it involved an experienced physician's application of generally accepted medical standards.

# ARGUMENT

## I.  The district court correctly denied Anderson's motion for judgment of acquittal.

A jury convicted Anderson of one count of conspiracy to unlawfully distribute controlled substances, eight counts of unlawful distribution of controlled substances, and one count of health care fraud. Anderson renews his challenge to the sufficiency of the evidence to support his convictions. The standard on appeal is the same standard applied by the district court: "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The sufficiency standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id*. Anderson fails to show that the evidence was insufficient to convict him.

A. *Sufficient evidence supported Anderson's convictions for conspiracy to unlawfully distribute controlled substances and unlawful distribution of controlled substances.*

The jury convicted Anderson of eight counts of unlawfully distributing controlled substances, in violation of 21 U.S.C. § 841(a)(1), and one count of conspiracy to do the same, pursuant to 21 U.S.C. § 846. To convict Anderson, a DEA-registered physician, of unlawful distribution, the government was required to prove that he distributed a controlled substance; that he acted intentionally or knowingly; and that he did not act for a legitimate medical purpose in the usual course of professional practice. *See* § 841(a)(1); 21 C.F.R. § 1306.04(a); *United States v. Volkman*, 797 F.3d 377, 387–88, 392 (6th Cir. 2015). To convict Anderson of the conspiracy count, the government was required to prove an agreement to violate the drug laws and Anderson's knowledge of, intent to join, and participation in the conspiracy. *See* § 846; *Volkman,* 797 F.3d at 390. Testimony from Marietta Medical staff, patients, pharmacists, law enforcement, and a medical expert, in addition to documentary evidence that included undercover recordings and Anderson's own patient files, overwhelmingly demonstrated that

36

Anderson conspired to prescribe[2]—and did prescribe—controlled substances without a legitimate medical purpose outside the usual course of professional practice. 21 U.S.C. §§ 841(a) & 846.

Start with the office itself. It was crowded. It was chaotic. It was overrun with pill-seekers. At 101 Putnam, patients spilled into the streets, prompting police intervention. At Putman Commons, patients snaked down the stairway to the first floor, where they loitered around the various shops.

Next, consider a typical appointment. Pill-seekers waited hours for an appointment that lasted a few minutes. Anderson performed inadequate medical examinations—or none at all—and often did not make any attempt to treat medical conditions (to the extent those conditions existed). *See United States v. Moore*, 423 U.S. 122, 142–43 (1975) (upholding sufficiency of evidence where, among other things, doctor "gave inadequate physical examinations or none at all"). He just

---

[2] Anderson does not advance a sufficiency challenge specific to the conspiracy count. He, instead, challenges the conspiracy count on the same basis as the distribution counts—that the government did not prove that he prescribed controlled substances without a legitimate medical purpose outside the usual course of professional practice. (App. Br., 47-56.)

wrote prescriptions. Patients dictated the types of medications—and sometimes even the dosages—prescribed. *See id.* (upholding sufficiency of evidence where, among other things, doctor "did not regulate the dosage at all"). The practice was so far outside the mainstream that one pill-seeker "wonder[ed] whether [she] was even legitimately a patient." (R.86, tr., 1790.)

Refills were no problem for pill-seekers. Anderson routinely refilled their opioid prescriptions without even seeing them. He did not question requests for early refills, let alone deny them. Patients placed their orders and then picked them up at a kiosk intended for shopping patrons. The process resembled restaurant takeout more than medical practice.

Anderson prescribed opioids in this manner despite repeated red flags indicative of drug abuse and diversion. *See Moore*, 423 U.S. at 142–43 (upholding sufficiency of evidence where, among other things, doctor "took no precautions against [ ] misuse and diversion"). Drug screens—when conducted—showed alarming results: patients tested negative for drugs Anderson had prescribed but tested positive for illegal drugs like cocaine and for other drugs he did not prescribe. *See*

*id.* (upholding sufficiency of evidence where doctor "ignored the results of tests he did make"). In addition, OARRS reports and communications from pharmacists and insurers indicated that patients were doctor and pharmacy shopping. Finally, patients exhibited physical signs of—and even admitted to—drug abuse. For example, Anderson repeatedly prescribed opioids to JB, an intravenous drug user with track marks all over her arms. Even a patient's flat-out admission to drug addiction did not deter Anderson. He prescribed additional opioids to the CS immediately after the patient told him that he was in "full-blown withdrawal." (R.86, tr., 1950-52.)

Staff members and pharmacists repeatedly alerted Anderson to these red flags, but he did not alter his prescribing practices. Nor did he alter them when staff members asked him to close the office and pharmacists refused to fill his prescriptions.

The government's medical expert, Dr. King, testified that Anderson's prescribing practices sharply deviated from professional norms. Dr. King highlighted that Anderson generally failed to establish an objective and legitimate diagnosis, to obtain medical treatment records, to perform meaningful physical examinations, to consider

comorbidities and other significant risk factors, to discuss alternative treatments, to develop treatment plans, and to enforce compliance monitoring. In addition to eschewing these standard practices, Anderson repeatedly prescribed opioids in dangerous combinations to patients who were clearly abusing their medications. Dr. King thus concluded that Anderson acted without a legitimate medical purpose and outside the course of usual medical practice for each prescription forming the basis of the distribution counts and many more. Anderson offered no testimony undermining Dr. King's findings.

In light of this overwhelming and uncontradicted evidence, a reasonable jury could certainly infer that Anderson prescribed controlled substances to patients who were abusing or misusing them, and thus that he issued prescriptions without a legitimate medical purpose and outside the usual course of professional practice. *See, e.g., Moore,* 423 U.S. at 142–43 (upholding sufficiency of § 841 conviction based on evidence of deficient prescribing practices, which included "inadequate physical examinations or none at all," "ignor[ing] test results," and "tak[ing] no precautions against [] misuse and diversion"); *United States v. McIver*, 470 F.3d 550, 563–65 (4th Cir. 2006)

40

(upholding § 841 and § 846 convictions where doctor "consistently prescribed large quantities of opioids despite warning signs that his patients were not using their medications as prescribed, were seeking his treatment specifically to obtain drugs, or were drug addicts"); *United States v. Feingold*, 454 F.3d 1001, 1004–05 (9th Cir. 2006) (upholding sufficiency of § 841 convictions where evidence "overwhelmingly demonstrated [physician's] disregard for proper prescribing practices").

Anderson's contrary arguments fail to grapple with the law and the evidence. First, for the reasons discussed above, the evidence did not show that Anderson committed "mere malpractice" or did not "conform to the government's opinion of what constituted a generally accepted standard." (App. Br., 52-56.) The jury instructions required a finding that Anderson acted without a legitimate purpose and outside the usual course of professional practice, and specifically highlighted that negligence on his part was not enough to find him guilty. (*See* R.89, tr., 2474, 2476-77.) Although defense counsel emphasized the distinction between negligence and criminality, and argued that

Anderson was merely negligent, the jury resoundingly rejected that argument.

Anderson's remaining arguments were also presented to—and rejected by—the jury. For example, Anderson persists in arguing that he only prescribed opioids to a fraction of his patients. On appeal, he "extrapolates" from the government's random sample to arrive at an 8% figure. (App. Br., 9-10.) At trial, defense counsel used different math to argue that Anderson prescribed opioids to only 1.2% of his patients—a figure based on the total number of files found in the office. (R.89, tr., 2437-38.) But the prosecutor addressed these "number games" in rebuttal, reminding jurors that the total number of files was not the same as the total number of active patients and that the uncontradicted testimony of Anderson's employees established that approximately 80% of the active patients at Putnam Commons were pill-seekers.

Anderson also argues that he sometimes kept medical records, performed physical examinations, conducted drug screens, dismissed patients for non-compliance, and so on, but that he simply did so with "sloppy documentation" and in a "hurried fashion." (App. Br., 55.) The evidence summarized above debunks this "mere malpractice" argument.

Moreover, even if Anderson did act as physician with respect to some patients (such as those suffering from infectious disease), the evidence showed that he discarded that role with respect to many others. Indeed, contrary to Anderson's contention (App. Br., 47), his conduct clearly "exceed[ed] the bounds of professional practice." *Moore,* 423 U.S. at 142-43.

Anderson also doubles down on his assertion that the DEA's failure to confiscate the confidential source's prescriptions suggests that the controlled substances were somehow medically necessary. (App. Br., 54-55.) The jury rejected this red herring, and for good reason. While the DEA did not interfere with the doctor-patient relationship and confiscate the pills, it did work swiftly—in conjunction with prosecutors—to establish probable cause for search warrants and to ultimately establish Anderson's guilt at trial.

Finally, Anderson continues to emphasize that "[e]ach patient treated by [him] complained of a medical condition" and that he "prescribe[d] needed medication to patients in pain." (App. Br., 55.) But physicians "do not have carte blanche to prescribe controlled drugs for a non-medical purpose simply because the immediate recipient of the

prescription has an illness that the drugs could in theory alleviate if used properly." *United States v. Kohli*, 847 F.3d 483, 491 (7th Cir. 2017); *accord United States v. Chaney*, 921 F.3d 572, 590-91 (6th Cir. 2019) ("a doctor prescribing opioid painkillers to anyone walking through the door is not saved if a person happens to have an underlying condition that could justify the prescription"). The correct inquiry examines the physician's reason for issuing the prescription rather than the patient's underlying conditions. *Chaney*, 921 F.3d at 590–91. The jury here concluded that Anderson's reasons were illegitimate, and that conclusion was well-supported by the evidence.

### B. Sufficient evidence supported Anderson's conviction for health care fraud.

In addition to the drug counts, the jury also convicted Anderson of one count of aiding and abetting the commission of health care fraud.[3] 18 U.S.C. §§ 1347 & 2. To convict Anderson of health care fraud, the government was required to prove that he knowingly devised a scheme or artifice to defraud a health care benefit program in connection with

---

[3] Anderson's brief mistakenly refers to additional counts of health care fraud and conspiracy to commit health care fraud (App. Br., 56), which the government voluntarily dismissed prior to trial. (R.40, verdict, 302.)

44

the delivery of or payment for health care benefits, items, or services;

executed or attempted to execute this scheme or artifice to defraud; and

acted with the intent to defraud. *United States v. Persaud*, 866 F.3d

371, 380 (6th Cir. 2017). Viewing the evidence in the light most

favorable to the government, sufficient evidence supported the jury's

verdict. *See Jackson*, 443 U.S. at 319.

The evidence at trial established that Anderson entered into

provider contracts with Medicare and Medicaid. As a provider,

Anderson agreed to render services that were "medically necessary" and

in "compl[iance] with [] laws, regulations, and program instructions."

(R. 87, tr., 2069, 2078-79.) Pointing to those contracts, program

administrators testified that Medicare and Medicaid would not pay

claims for services or items that were medically unnecessary or for

prescription drugs issued in violation of state or federal law. This

testimony—combined with the overwhelming evidence that Anderson

knowingly issued opioid prescriptions to drug addicts who were abusing

them—permitted the jury to reasonably infer that Anderson issued the

prescriptions with an intent to defraud. Anderson knew both that the

prescriptions were fraudulent (i.e., medically unnecessary and lacking a

45

legitimate purpose) and that pharmacies would submit claims to insurers, including Medicare and Medicaid, based on them.

Additional testimony established that the programs were, in fact, defrauded. Analyses of prescription claims data showed that Medicare and Medicaid paid thousands of dollars for medications Anderson had prescribed with no legitimate medical purpose outside the course of professional practice, including specific prescriptions that were the subjects of unlawful distribution counts. (R.87, tr., 2055-61, 2083-89.)

Anderson objects to the government's theory of prosecution, observing that he could not "find a single case in which such a theory of health care fraud was supported." (App. Br., 58.) But the theory pursued here was not novel. Both the Seventh and Eleventh Circuits have upheld health care fraud convictions against physicians who unlawfully prescribed controlled substances, thereby causing pharmacies to bill health care benefits programs on the basis of those prescriptions. *See United States v. Webb,* 655 F.3d 1238, 1244, 1258 (11th Cir. 2011) ("the type of health care fraud here involved [the defendant's] prescribing controlled substances for other than legitimate medical purposes, and having pharmacies submit claims for

46

reimbursement to health insurers on the basis of his prescriptions"); *United States v. Bek*, 493 F.3d 790, 797, 801 (7th Cir. 2007) (defendant "was aware that he prescribed unnecessary medication and that the health care benefit programs would ultimately pay some (or all) of the costs of those medically unnecessary drugs").

Anderson also attacks the sufficiency of the evidence on the ground that he "had no knowledge of how the prescription[s] would be paid." (App. Br., 58.) But there was ample evidence that Anderson knew that his prescriptions were submitted to—and paid by—insurers. Indeed, Anderson received letters from insurance carriers alerting him that patients were doctor shopping. (*See, e.g.*, R.57, tr., 497, 504-05 (patient's chart contained a "formal letter" from insurance carrier to Anderson, "the prescriber," highlighting "pharmacy claims available" and stating that the patient was "doctor shopping"); R.87, tr., 2133 (testimony that "insurance[] carriers] would send in papers . . . that [patients] received medicine from other doctors").) Moreover, the unrebutted and uncontradicted evidence showed that Anderson knew that some of his patients—including patients who were the subjects of distribution counts—received prescription drug coverage through

47

Medicare or Medicaid. (App. App'x (Vol. II), 1096 (hospital record indicating patient KB (Count 4) had Medicare); *id.*, 1161-62 (copy of Medicaid card belonging to JB (Count 2).) For example, patient JB testified that Anderson once warned her that Medicaid would not cover an oxycodone prescription and so prescribed her hydrocodone instead. (R.83, tr., 1243; *see also id.*, 1226-27 (JB testifying that Anderson advised her to pay cash for a prescription because she "had already exceeded the limit of prescriptions" that her "medical card" would cover).) In light of this evidence, a rational jury could certainly conclude that Anderson was aware that health care benefit programs were paying for the medically unnecessary and unlawful prescriptions.

The Seventh Circuit's decision in *United States v. Bek*, 493 F.3d 790 (7th Cir. 2007), supports that conclusion. In *Bek*, the defendant advanced a similar sufficiency challenge, arguing that "he could not have committed or aided and abetted health care fraud because he did not know that his patients were using health insurance to pay for their prescriptions." *Id.* at 801. But the defendant in *Bek* had received "a letter telling him that [a pharmacy benefit] company had paid to fill some of the prescriptions he issued and that 'there [was] potential over-

utilization for controlled substances.'" *Id.* Based on that evidence, the Seventh Circuit held that "a rational jury could conclude . . . that [the defendant] was aware that he prescribed unnecessary medication and that the health care benefit programs would ultimately pay some (or all) of the costs of those medically unnecessary drugs." *Id.*

Anderson's additional insufficiency arguments—that he did not submit claims for reimbursement to insurers and "did not profit from the reimbursement of such prescription[s]"—also fail. (App. Br., 58.) As explained above, Anderson did not need to submit the claims himself in order to be found guilty because he was charged under an aiding and abetting theory. (R.89, tr., 2480-81 (jury instructions explaining aiding and abetting theory).) *See Bek,* 493 F.3d at 801 (upholding conviction for aiding and abetting health care fraud where defendant caused pharmacies to bill health care benefit programs for medically unnecessary drugs); *Webb*, 655 F.3d at 1258–59 (same). Nor did Anderson's guilt depend on his personal financial gain.[4] The government was not required to prove that Anderson received any

---

[4] The jury could certainly infer that Anderson financially benefited from the scheme, however, because it resulted in repeat visits from pill-seeking patients.

money—only that he caused the submission of false claims as part of a scheme to defraud a health care benefit program. (R.89, tr., 2480.) Weighing the evidence in the light most favorable to the government, Anderson cannot show that the evidence was insufficient to convict him.

## II. The district court did not abuse its discretion by omitting the proposed good-faith instruction, and the omission did not prejudice Anderson in any event.

In reliance on this Court's decision in *Godofsky*, the district court did not include the initially proposed good-faith instruction for the unlawful-distribution counts, reasoning that it was "subsumed" by the other instructions. (R.89, tr., 2390.) Anderson renews his challenge to the district court's omission of that instruction.

This Court reviews the trial court's denial of a requested jury instruction for abuse of discretion and will reverse only if the denied instruction was: (1) a correct statement of the law; (2) not substantially covered by the charge actually delivered to the jury; and (3) concerned a point so important in the trial that the failure to give it substantially impaired the defendant's defense. *Godofsky*, 943 F.3d at 1019. Even if

Anderson could satisfy the first prong,[5] he cannot satisfy the other two. There was no error, and certainly no reversible error, in the instructions given.

### A. *The concept of good faith was substantially covered by the other instructions.*

Federal law generally prohibits the distribution of controlled substances. 21 U.S.C. § 801 *et seq*.; 21 U.S.C. § 841(a). The prohibition does not apply, however, to a physician who is "registered by" the DEA and who prescribes controlled substances "to the extent authorized by [his] registration." 21 U.S.C. § 822(b); *see* 21 U.S.C. § 823(f). A DEA registration authorizes a physician to prescribe a controlled substance so long as the prescription is "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional

_____

[5] The Supreme Court's recent certiorari grants may shed light on the meaning and role of good faith in prosecutions of registered practitioners under § 841. *See Ruan v. United States*, S.Ct. No. 20-1410 (Nov. 5, 2021); *Kahn v. United States*, S.Ct. No. 21-5261 (Nov. 5, 2021). Consistent with the government's brief in that case, the proposed instruction here, to the extent it rested on the defendant's personal belief regarding what constituted proper medical practice (*see* R.26, gov't inst., 240), was not a correct statement of law. Whatever potential significance the Supreme Court's eventual decision may have to the correctness of the proposed instruction in this case, however, Anderson's argument clearly fails under the remaining prongs.

practice" pursuant to 21 C.F.R. § 1306.04(a). *See Moore*, 423 U.S. at 136 n.12 (1975); *Gonzales v. Oregon*, 546 U.S. 243, 257 (2006). A physician who makes no objectively reasonable "honest effort" to conform to that standard is not relying in "good faith" on the registration. *Moore,* 423 U.S. at 139, 142, n.20.

While this Court has approved instructions expressly addressing "good faith," (*e.g.*, *Volkman*, 797 F.3d at 387-88), it has also held that an express good-faith instruction is not necessarily required. *Godofsky*, 943 F.3d at 1028 (citing *United States v. DeBoer*, 966 F.2d 1066, 1068 (6th Cir. 1992)). "[I]nstead, some instructions under some facts or circumstances, may 'effectively inform[ ] the jury of the good faith defense' without explicit reference to it." *Id.* (quoting *DeBoer*, 966 F.2d at 1068). The instructions here did that.

The instructions given by the district court combined Sixth Circuit Pattern Instruction 14.02, which sets forth the elements stated in § 841(a)(1), and the explanatory language in 21 C.F.R. § 1306.04(a), which delimits the statutory exception to criminal liability for a physician who prescribes in the manner authorized by his DEA registration. The instructions required the government to prove: (1)

"that the defendant knowingly or intentionally dispensed or distributed a Schedule II controlled substance;" and (2) "that the defendant [] prescribed the drug without a legitimate medical purpose and outside the course of professional practice."[6] (R.89, tr., 2474.) The instructions also provided proper context for the second element, explaining:

> Federal law authorizes registered medical practitioners to dispense a controlled substance by issuing a lawful prescription. Registered practitioners are exempt from criminal liability if they distribute or dispense controlled substances for a legitimate medical purpose while acting in the usual course of professional practice.

(*Id.*, 2476.)

By featuring the language from § 1306.04(a) front and center, the instructions made clear that Anderson could not be found guilty if he prescribed for a legitimate medical purpose in the usual course of professional practice. *See Moore*, at 137 n.13, 140–42. And the instructions further explained that, "[i]n making medical judgments

---

[6] The instruction setting forth the elements of unlawful distribution states "outside the course of professional practice." (R.89, tr., 2474.) However, "usual" modified "course of professional practice" in most other places. *See, e.g.*, R.89, tr., 2476 ("Registered practitioners are exempt from criminal liability if they distribute or dispense controlled substances for a legitimate medical purpose while acting in the usual course of professional practice.").)

concerning the appropriate treatment for an individual, [ ] physicians have discretion to choose among a wide range of available options." (*Id.*)

This Court has previously upheld unlawful-distribution instructions that did not include an explicit good-faith instruction where, as here, "the judge reviewed with the jury the provisions of 21 U.S.C. § 841(a)(1) and further instructed . . . that physicians . . . were exempt from liability if they distributed controlled substances in the usual course of business pursuant to 21 C.F.R. § 1306.04." *DeBoer*, 966 F.2d at 1068 (discussing omission of good-faith instruction on plain-error review); *United States v. Carroll*, 518 F.2d 187, 189 (6th Cir. 1975) (approving of instruction given in *White v. United States*, 399 F.2d 813, 816–17 (8th Cir. 1968), that made no mention of good faith but instructed that a physician was exempted from liability if he "act[ed] in the ordinary and authorized course of his practice").

The instructions here, however, further incorporated the concept of good faith. The court issued a deliberate-ignorance instruction, which required the jury to find that Anderson *knowingly* prescribed the

54

controlled substances without a legitimate medical purpose in the usual

course of professional practice.[7] The instruction stated:

> Although knowledge of the defendant cannot be established merely by demonstrating he was careless, knowledge may be inferred if the defendant deliberately blinded himself to the existence of a fact. No one can avoid responsibility for a crime by deliberately ignoring the obvious. If you are convinced that the defendant deliberately ignored a high probability that the controlled substance was distributed or dispensed without a legitimate medical purpose in the usual course of a professional practice, then you may find that the defendant knew that this was the case. But you must be convinced beyond a reasonable doubt that the defendant was aware of a high probability that the controlled substances were distributed or dispensed other than for a legitimate medical purpose while acting in the usual course of professional practice, and that the defendant deliberately closed his eyes to what was obvious. Carelessness, or negligence, or foolishness on his part are not the same as knowledge and are not enough to find him guilty on this count.

(R.89, tr., 2476-77.) *Cf. Volkman*, 797 F.3d at 387-88.

---

[7] In so doing, the instructions went beyond what the text of the statute requires. In fact, the "knowingly or intentionally" language in § 841(a) comes after the "except as authorized by this subchapter" clause, and thus only applies to the verbs that follow it, not the exception clause. *Cf. United States v. Yermian*, 468 U.S. 63, 68-70 (1984) (interpreting similarly structured provision).

Fairly read and taken as a whole, the instructions required the jury to find that Anderson knowingly[8] prescribed opioids without a legitimate purpose in the usual course of professional practice. The concept of good faith was thus substantially covered because Anderson could not have knowingly prescribed controlled substances without a legitimate purpose in the usual course of professional practice and also acted in good faith. *See Godofsky*, 943 F.3d at 1021 ("[Defendant] could [not] have knowingly prescribed oxycodone for an illegitimate purpose if he had reasonably believed the prescriptions were for legitimate medical purposes.").

This Court has previously upheld similar instructions that did not explicitly mention "good faith" but required the jury to find that the defendant knew his prescriptions were not for a legitimate purpose. In *Godofsky*, the instructions required the jury to find "that [the

---

[8] While the elements set forth by the instructions stated only that the jury had to find that "the defendant prescribed the drug without a legitimate medical purpose and outside the course of professional practice," the later instructions clearly modified them. The instructions regarding deliberate ignorance would make no sense if "knowingly" were limited to the act of writing a prescription. *See United States v. Mahbub*, 818 F.3d 213, 230 (6th Cir. 2016) ("no single provision of the jury instruction can be read in isolation; instead, the charge must be considered as a whole") (internal quotation marks omitted).

56

defendant's] prescriptions of oxycodone were knowingly or intentionally outside the scope of ordinary professional medical practice (unprofessional) and *knowingly or intentionally* not for a legitimate medical purpose (illegitimate)." *Id.* at 1021 (emphasis in original). Reasoning that "reasonable conduct or beliefs, if proven, would necessarily prevent the jury from finding that [the defendant] had a knowing or intentional mens rea," this Court found that the instructions provided to the jury substantially covered good faith. *Id.*; *accord United States v. Hubbard*, 843 F. App'x 667, 673-74 (6th Cir. 2019) (instructions effectively informed jurors of good-faith defense where "judge reviewed . . . the provisions of 21 U.S.C. § 841(a)(1) and further instructed them that . . . they had to find that [the defendant] was aware that he was distributing oxycodone without a legitimate medical purpose").

Moreover, contrary to Anderson's contention (App. Br., 15-16), the instructions clearly distinguished between civil and criminal liability. The deliberate-ignorance instruction expressly prohibited the jury from convicting Anderson based on mere negligence. (R.89, tr., 2465 ("Carelessness, or negligence, or foolishness on his part is not the same

as knowledge.").) In addition, the instruction made clear that the jury could not find Anderson guilty if he lacked criminal intent. In this way, the instructions—which required proof that Anderson knowingly prescribed controlled substances without a legitimate purpose— imposed a standard at least as onerous as the requested good-faith instruction. *See Volkman*, 797 F.3d at 386 ("knowingly distributing prescriptions outside the course of professional practice is a sufficient condition to convict a defendant under the criminal statutes relating to controlled substances").

Anderson is also wrong to assert that "the only instructions provided to the jury . . . permitted . . . a convict[ion] . . . for violations of an objective standard of practice put forth by Dr. King." (App. Br., 25.) The court defined "usual course of professional practice" to mean "medical practice generally recognized and accepted in the United States"[9] (R.89, tr., 2442-43), and Dr. King appropriately and reliably

---

[9] Separately, in his sufficiency discussion, Anderson suggests that he disagrees with the district court's definition of "usual course of professional practice" as "act[ing] in accordance with a standard of medical practice generally recognized and accepted in the United States." (App. Br., 53.) But in addition to failing to object to that instruction below, he offers no substantive basis for his disagreement. That failure results in waiver. *United States v. Stewart*, 628 F.3d 246,

opined on standard medical practice. *See infra* III. Anderson was free to put forth his own medical expert to opine that his prescribing practices reflected a legitimate medical purpose in the usual course of professional practice, but he did not do so.

Finally, Anderson's reliance on *United States v. Hurwitz*, 459 F.3d 463 (4th Cir. 2006), is misplaced. In that case, the Fourth Circuit did reverse a physician's convictions on unlawful-distribution counts because the jury was not instructed on good faith. But Anderson overlooks two critical differences. First, the instructions in *Hurwitz*, unlike this one, "permitted the jury to convict even if it concluded that [the defendant] did not know that any given prescription was not for a legitimate medical purpose or was beyond the bounds of medical practice." *Id.* at 475. Here, in contrast, the instructions required the jury to find that Anderson knowingly prescribed without a legitimate purpose. Second, the trial court in *Hurwitz* instructed the jury that "good faith applie[d] only" to the other counts against the defendant. *Id.*

---

256 (6th Cir. 2010) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") Even if considered, however, Anderson could not show error, let alone plain error, particularly where he points to no relevant regional differences.

at 476. The court thus "not only declined to give a good-faith instruction with regard to the drug counts, but also informed the jury that it *could not* consider good faith when deciding to convict [the defendant] of drug trafficking under § 841." *Id.* at 476 (emphasis in original). There was no such nullification of Anderson's good-faith defense here.

   *B. The omission did not substantially impair Anderson's defense.*

In any event, even if the omitted instruction were appropriate and not substantially covered by the other instructions, its omission did not substantially impair Anderson's defense. *Godofsky*, 943 F.3d at 1027-29; *see also* Fed. R. App. Proc. 52(a) ("Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded.").

As a preliminary matter, despite the lack of an express good-faith instruction, defense counsel effectively advanced a good-faith defense to the jury without objection from the government. Counsel focused on "Appalachia['s] [] huge narcotic abuse problem" and argued that Anderson was "trying to do the best he [could] under difficult circumstances in a practice that [was] not as well run as it should [have] been." (R.89, tr., 2428, 2449.) In invoking this good-faith defense, counsel read the entirety of the deliberate-ignorance instruction,

60

specifically highlighting that "[c]arelessness or negligence or foolishness . . . are not the same as knowledge and are not enough to find him guilty . . . ." (*Id.*, 2442.) Counsel then distinguished between malpractice and criminal liability. (*Id.*, 2429) (explaining difference between "whether records were complete and whether the practice [was] poorly run versus whether there's proof beyond a reasonable doubt that Dr. Anderson engaged in criminal activity"). The lack of a good-faith instruction thus did not impair Anderson's ability to present this theory.

The problem for Anderson was not the absence of a good-faith instruction; it was that there was virtually no evidence to support the argument that he prescribed in good faith with a legitimate medical purpose in the usual course of professional practice.

That lack of competing testimony further distinguishes this case from *Hurwitz*, which found that the omission of a good-faith instruction was not harmless, despite "powerful and strong[]" evidence of the physician's guilt. *Hurwitz*, 459 F.3d at 481-82. The reversal in *Hurwitz* hinged on testimony from a defense expert that the defendant's

treatment was "medically proper" and testimony from the defendant and his staff that that practice was "legitimate." *Id.* at 482.

There was no similar evidence here. As a result, to support the theory that Anderson was "trying to treat [patients'] pain," defense counsel highlighted the medical conditions and injuries from which his patients suffered. But the jury instructions, following this Court's decision in *United States v. Chaney*, 921 F.3d 572, 589 (6th Cir. 2019), made clear that that "[t]he physician's reason for prescribing opioids, not the patient's condition, [was] the key factor" and that it was "not enough that the patients had some legitimate need or condition that might justify the prescription of opioid pain medication." (R.89, tr., 2477-78.) That unchallenged instruction—not the omission of the good-faith instruction—undermined Anderson's attempt to rely on patients' conditions rather than his own prescribing practices.

The only remaining evidence defense counsel cited in support of Anderson's alleged good intentions were statements he made in a 2017 application in which he sought reinstatement of his prescribing privileges. In that application, Anderson stated that "[t]he rural area in which [he] practiced was much underserved for pain management, and

[he] attempted to fill the gap as pain management patients were placed in pain management practices." (R.89, tr., 2428.) But this general "attempt-to-fill-the-gap" assertion shed no light on his prescribing for particular patients.

Under the facts and circumstances of this case, even if the district court had given the requested instruction, it would not have affected the outcome.[10] Anderson abdicated his medical judgment by dispensing dangerous opioids to patients who were drug addicts (or became drug addicts based on his prescribing practices). Like the doctor in *Godofsky*, he could not have plausibly believed that he was acting in good faith. *See Godofsky*, 943 F.3d at 1027-29 (lack of good-faith instruction did not substantially impair defense "based on the facts, law, and theories of th[e] case"); *Feingold*, 454 F.3d at 1012 (determining that any instructional error in § 841 case was harmless, where "overwhelming"

---

[10] Indeed, the jury convicted Anderson on not only the distribution counts but on the conspiracy count (which expressly required a finding that Anderson "knew the conspiracy's main purpose was to distribute a controlled substance outside the scope of professional practice and not for a legitimate medical purpose") and on the health care fraud count (which required a finding that Anderson acted with "an intent to defraud").

evidence included proof that the defendant physician prescribed drugs

"to people whom he knew to be addicts, to people whom he had never

examined, . . . and to undercover law enforcement officials who did little

more than tell him they wanted narcotics").

### III. The district court did not abuse its discretion by admitting expert testimony regarding Anderson's prescribing practices.

Anderson acknowledges that "[e]xpert testimony on whether

prescriptions are medically appropriate has long been the norm in

controlled-substances prosecutions." (App. Br., 31 (quoting *United

States v. Lang*, 717 F. App'x 523, 534 (6th Cir. 2017) (citations

omitted)).) And he does not dispute that Dr. King, who routinely

testifies in such cases, "has never had his testimony excluded at trial."

(R.16-2, decl., 104; R.29, order, 266.) Anderson maintains, however, that

the district court should have excluded his testimony in this case.

Anderson argues that the district court abandoned its gatekeeping

role by failing to make specific reliability findings and abused its

discretion by admitting testimony that was not sufficiently reliable

under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579

(1993). The record refutes these claims and reveals no abuse of

64

discretion. *United States v. LaVictor*, 848 F.3d 428, 443 (6th Cir. 2017) (reviewing reliability determination for abuse of discretion).

The district court is the "gatekeep[er]" of expert testimony. *Daubert,* 509 U.S. at 597. Under *Daubert*, the district court must "ensur[e] that an expert's testimony [] rests on a reliable foundation . . ." *Id.* Federal Rule of Evidence 702 codifies this standard, requiring scientific testimony to be "the product of reliable principles and methods." Fed. R. Evid. 702(a), (c). The district court has "broad latitude" and "considerable leeway" in deciding how to determine reliability. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152-53 (1999).

The district court fulfilled its gatekeeping role here. The court conducted a Daubert hearing to consider Anderson's claim that Dr. King's proposed testimony was not sufficiently reliable. At the hearing, Dr. King testified about the sources forming the basis for his methodology, elaborated on the standards of care drawn from those sources, and explained how he analyzed Anderson's conduct under those standards. Following the hearing, the district court issued a written opinion, holding that "Dr. King's proposed expert testimony me[t] the

reliability standard under Rule 702" and that any "concerns . . . about methodology [could] be adequately address[ed] on cross-examination." (R.29, order, 264-65.)

Contrary to Anderson's claim (App. Br., 30-31), the district court supported that conclusion with specific findings. For example, the district court found that Dr. King relied on "accepted standards of care in the field of pain management" in conducting his analysis of patient records, including standards recognized by the Federation of State Medical Boards. (R.29, order, 264-66.) In addition, it highlighted Dr. King's "thirty years of experience in pain management" and board specializations in pain medicine and pain management. (*Id.*, 265.) The district court explained that it found Dr. King's method of chart review reliable because it involved an experienced physician's application of generally accepted medical standards. (*Id.*, 263-66.) The district court's findings were sound.

Anderson's claim that Dr. King "constructed his standard out of thin air" similarly does not stand up to scrutiny.[11] (App. Br. 43-44.) Dr.

---

[11] To the extent Anderson criticizes Dr. King's expert reports for failing to identify the "principles and methods" applied (App. Br., 27-28), such criticism is misplaced and misleading. Dr. King detailed those

King primarily based his fifteen-point standard on a model set of guidelines issued by the Federation of State Medical Boards. (R.16-2, decl., 102; R.24, hearing, 177.) Courts have repeatedly upheld the reliability of methodologies based on that source. *See, e.g., United States v. Azmat*, 805 F.3d 1018, 1042 (11th Cir. 2015) (affirming reliability of methodology based on the Federation of State Medical Boards Model Policy); *United States v. Li*, 819 F. App'x 111, 119 (3d Cir. 2020) (same). Dr. King additionally consulted other reliable sources: peer-reviewed articles and publications issued by the DEA and the CDC.[12] *See Daubert*, 509 U.S. at 594 (reliability is enhanced if the research is "subject[ed] to the rigors of peer review and publication"). Anderson has not shown that any of these sources are not generally accepted by the medical community. *See United States v. Bonds*, 12 F.3d 540, 562 (6th Cir. 1993) (methodology must have "general acceptance" within the

---

principles and methods in a separate declaration. (R.16-2, decl., 99-104.) That declaration also clearly set forth the sources for those standards. (*Id.*, 102-03.)

[12] At the Daubert hearing, Dr. King testified that he did not rely on new standards or guidelines that were not in place during the relevant time period. (*See, e.g.*, R.24, 180-81.)

67

community). Nor could he. *See Azmat*, 805 F.3d at 1042; *Li*, 819 F. App'x at 119.

Finally, the fact that Dr. King's standard was not lifted verbatim from a single "textbook, peer-reviewed publication, or other scholarly resource" does not make it unreliable. After all, his methodology was based on published sources generally accepted by the medical community. And Anderson does not allege—nor does the caselaw support—the idea that there is only one valid and reliable standard for experts in physician prosecutions under § 841(a).

Anderson's related claim that Dr. King's opinions amounted to "scientific guesswork" also lacks any support. (App. Br., 42.) For each patient file, Dr. King examined Anderson's prescribing decisions against the fifteen standards of care and noted instances where Anderson failed to adhere to those generally accepted standards—such as failing to establish an objective medical diagnosis, failing to perform a meaningful medical examination, and failing to appropriately use drug testing. The methodology Dr. King employed is consistent with the methodologies employed by experts in similar cases, and courts have upheld those methodologies as reliable. For example, in *United States v.*

*Azmat*, 805 F.3d 1018, 1042 (11th Cir. 2015), the Eleventh Circuit affirmed the district court's denial of the defendant-physician's Daubert motion, where the expert relied on "published sources generally accepted by the medical community in defining the applicable standard of care" in addition to his own experience. *Accord Li*, 819 F. App'x at 119 (affirming district court's Daubert reliability determination, where expert drew on his experience as a pain management doctor and "based his testimony on reliable and generally accepted techniques"); *see also Volkman*, 797 F.3d at 388-89 (approving of admission of expert testimony in which the expert discussed "a patient's condition and the prescriptions [the defendant] dispensed" and the expert opined "as to whether the prescriptions fell within the scope of legitimate medical practice").

Anderson's remaining quibbles challenge the weight—not the admissibility—of Dr. King's testimony. (App. Br., 35-42.) For example, Anderson alleges that Dr. King misread certain patient data and finds fault in certain conclusions he reached. (*Id*.) But all of this was fodder for cross-examination. *Daubert*, 509 U.S. at 596 ("Vigorous cross-examination . . . [is a] traditional and appropriate means of attacking

69

shaky but admissible evidence."). The government produced the patient files and expert reports to Anderson, and he had every opportunity to cross-examine Dr. King about these issues. *See United States v. Chalhoub*, 946 F.3d 897, 907 (6th Cir. 2020) (defendant physician "had a full and fair opportunity to cross-examine [expert] who testified about his use of [] procedures" and could have sought to impeach him); *Lang*, 717 F. App'x at 536 (expert "may have been unaware of some relevant data, but he was aware of enough data for his opinion to be sufficient" and defendant "was free to impeach [the expert], to introduce [] contrary evidence, and to argue the incompleteness to the jury").

The district court did not abuse its discretion in admitting Dr. King's testimony. Moreover, even if Anderson could show an abuse of discretion, it would be harmless given the other overwhelming evidence of guilt. *See, e.g., United States v. Farrad,* 895 F.3d 859, 885 (6th Cir. 2018) (admission of unreliable expert testimony harmless); *United States v. Word,* 806 F.2d 658, 663 (6th Cir. 1986) ("there are cases in which the lay testimony is so clear that no expert testimony is required to determine that the defendant's actions were not for a legitimate medical purpose nor in the usual course of professional practice"). The

lay testimony the jury heard left no doubt that Anderson's practice and prescriptions clearly crossed the line. *See Word*, 806 F.2d at 663 (lay testimony, including defendant's issuance of prescriptions to individuals he did not examine, sufficient to support unlawful distribution by physician); *accord* Chaney, 922 F.3d at 591; *United States v. Elliott*, 876 F.3d 855, 864 (6th Cir. 2017).

## CONCLUSION

This Court should affirm the judgment of the district court.

Respectfully submitted,

KENNETH L. PARKER
United States Attorney


/s/ Alexis J. Zouhary
ALEXIS J. ZOUHARY
Assistant United States Attorney
221 East Fourth Street
Cincinnati, Ohio  45202
(513) 684-3711
Alexis.Zouhary@usdoj.gov

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation provided in Rule 32(a)(7)(B)(i) of the Federal Rules of Appellate Procedure. The brief contains 12,814 words of Century Schoolbook (14 pt) proportional type. Word for Microsoft 365 is the word-processing software that I used to prepare this brief.

/s/ Alexis J. Zouhary  
ALEXIS J. ZOUHARY

## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

The following are relevant under Sixth Circuit Rule 30(g).

| Record number | Description | PAGE ID# |
| --- | --- | --- |
| 13 | motion | 70–74 |
| 16 | response | 81–105 |
| 24 | transcript | 123–229 |
| 26 | proposed jury instructions | 234–249 |
| 29 | opinion and order | 261–266 |
| 40 | verdict | 293–302 |
| 57 | transcript | 357–665 |
| 82 | transcript | 943–970 |
| 83 | transcript | 1139–1303 |
| 84 | transcript | 1304–1531 |
| 85 | transcript | 1532–1729 |
| 86 | transcript | 1730–1963 |
| 87 | transcript | 1964–2163 |
| 88 | transcript | 2164–2386 |
| 89 | transcript | 2387–2527 |

## CERTIFICATE OF SERVICE

I certify that this Brief for Plaintiff-Appellee United States was served on counsel for Defendant-Appellant Anderson by filing with the Court's CM/ECF system this 9th day of February, 2022.

/s/ Alexis J. Zouhary
ALEXIS J. ZOUHARY